**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DELAWARE VALLEY MANAGEMENT, LLC T/A PRINCETON MEDICAL MANAGEMENT INNOVATIONS, <u>ET AL.</u>,** | : : : : : | **CIVIL ACTION** |
| *Plaintiffs,* | : : | |
| v. | : : | **No. 2:20-cv-4309** |
| **CONTINENTAL CASUALTY COMPANY,** | : : : | |
| *Defendant.* | : : | |

<u>**MEMORANDUM OPINION**</u>

**Goldberg, J.**                                                    **November 10, 2021**

The COVID-19 pandemic has had devastating effects on businesses across the United States, as governmentally-imposed shutdown orders forced them to close or seriously limited their ability to operate. Many of these businesses have sought recovery from their insurance companies for their business-related losses. Hundreds of similar lawsuits have been winding their way through the state and federal courts.[1]

Plaintiffs in the case before me own and operate a group of thirteen affiliated medical practices and sought such coverage from their insurer, Defendant Continental Casualty Company. Defendant denied coverage, and Plaintiffs sued for breach of contract and a declaratory judgment.

---

[1]   The University of Pennsylvania School of Law has been tracking these cases on a nationwide basis. <u>See</u> https://cclt.law.upenn.edu.

For the following reasons, I will grant Defendant's motion and dismiss the Amended Complaint.

## I.      FACTS IN THE AMENDED COMPLAINT

The following facts are set forth in the Amended Complaint:[2]

### A.      <u>The Insurance Policy</u>

Plaintiffs provide neurological and sports medicine services to patients with brain, spine, and joint injuries at their thirteen medical practices and treatment facilities located throughout Pennsylvania and New Jersey.  (<u>See</u> Amended Complaint, attached as Exhibit "A" ¶ 1.)  Plaintiffs' thirteen campus locations (the "Covered Properties") are owned, managed, and/or controlled by the Plaintiffs.  (<u>Id.</u> at ¶ 26.)

To protect their businesses from property damage and loss of income, Plaintiffs purchased a "CNA Connect"[3] Policy and related endorsements (the "Policy") from Defendant, which insured their medical practices for the period of September 1, 2019 to September 1, 2020.  The Policy is an "all-risk" policy that provides coverage for all non-excluded business losses, and also includes Business Income Coverage, Extra Expense Coverage, and Civil Authority Coverage.  (<u>Id.</u> at ¶ 3-4.) The Policy does not have any exclusions for losses caused by the spread of viruses or communicable disease.  (<u>Id.</u> at ¶ 5.)

The Policy covers all lost income the insured sustains during a "necessary suspension" of "operations" during the "period of restoration." (<u>Id.</u>, Ex. 1, p. 54.) As a threshold requirement for

---

[2]      In deciding this motion, I must accept all factual allegations in the complaint as true, construe the complaint in the light most favorable to the plaintiffs, and determine whether, under any reasonable reading, the plaintiffs may be entitled to relief.  <u>Atiyeh v. Nat'l Fire Ins. Co. of Hartford</u>, 742 F. Supp. 2d 591, 596 (E.D. Pa. 2010).

[3]      CNA Financial Incorporation is Defendant Continental's parent company.  CNA was originally named as a Defendant in this lawsuit but was dismissed without prejudice by Stipulation on November 3, 2020. (ECF No. 10).

Business Income and Extra Expense Coverage, the Policy requires "direct physical loss of or damage to" the Covered Property.  (Id., Ex. 1., p. 54-56.) The Civil Authority endorsement of the Policy requires that an action of civil authority that was caused by "a direct physical loss of or damage to a premises other than the Covered Property" ultimately prohibits the insured's access to the Covered Property.

> The Business Income endorsement states, in pertinent part:

> > We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration."  The suspension must be caused by direct physical loss or direct physical damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss.

(Id., Ex. 1., p. 54.)

> The Civil Authority endorsement specifically provides, in pertinent part:

> > When the Declarations show that you have coverage for Business Income and Extra Expense, you may extend that insurance to apply to the actual loss of Business Income you sustain and reasonable and necessary Extra Expense you incur caused by action of civil authority that prohibits access to the described premises. The civil authority action must be due to direct physical loss of or damage to property at locations, other than [the] described premises, caused by or resulting from a Covered Cause of Loss.

(Id., Ex. 1., p. 80.)

**B.      The Cause of Loss**

On March 11, 2020, the World Health Organization officially declared COVID-19 a global pandemic.  (Am. Compl. at ¶ 50.) To prevent the spread of the virus, civil authorities throughout the country issued orders mandating the suspension of non-essential businesses across a variety of industries.  (Id.)

On March 6, 2020, Pennsylvania Governor Tom Wolf declared a public health state of emergency in the Commonwealth due to COVID-19. (Id., ¶ 72, Ex. 3.) Then, on March 19, 2020, Governor Wolf issued an order requiring the closure of all "non-life-sustaining" businesses in Pennsylvania. (Id., ¶ 75, Ex. 6.) Life sustaining businesses that could remain open were required to follow "social distancing practices and other mitigation measures." (Id.) This order also specifically prohibited all elective and/or non-emergency surgeries or procedures. (Id.) New Jersey Governor Phil Murphy issued similar orders closing all non-life-sustaining businesses in New Jersey and prohibiting all elective surgeries around the same time frame. (Id. at ¶¶ 73-77.)

Plaintiffs' medical practices were subject to the orders prohibiting all elective surgeries. Accordingly, Plaintiffs had to suspend all surgeries and invasive procedures that could be delayed without undue risk to the health of the patient, which "greatly hurt" their business. (Id. at ¶ 77.) Plaintiffs do not allege that the COVID-19 virus was present at their properties. Rather, they allege that because the nature of their business requires doctors and patients to interact in enclosed spaces during procedures, their properties became "contamination zones" due to the "rapid person to property transmission of the virus." (Id. at ¶¶ 88-90.) Plaintiffs do not allege that they were forced to completely shut their facilities down. Instead, Plaintiffs assert that as a direct result of the Closure Orders, they were "forced to considerably limit their businesses." (Id. at ¶ 87.)

**C.    The Lawsuit**

Plaintiffs submitted a business interruption claim to Defendant under the Policy, which Defendant denied on July 16, 2020. On September 2, 2020, Plaintiffs filed suit alleging breach of contract under the Business Income, Extra Expenses, and Civil Authority provisions of the Policy. Plaintiffs also sought a declaratory judgment that its business losses were covered under the Policy.

Plaintiffs filed an Amended Complaint on December 8, 2020, and, on January 19, 2021, Defendant moved to dismiss all claims in the Amended Complaint.

## II.  STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005).  The United States Supreme Court has recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quotations omitted).  "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" and only a complaint that states a plausible claim for relief survives a motion to dismiss.  Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. at 678.  A complaint does not show an entitlement to relief when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.  Id. at 679.

The Court of Appeals has detailed a three-step process to determine whether a complaint meets the pleadings standard.  Bistrian v. Levi, 696 F.3d 352 (3d Cir. 2014).  First, the court outlines the elements a plaintiff must plead to state a claim for relief.  Id. at 365.  Next, the court must "peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth."  Id.  Finally, the court "look[s] for well-pled factual allegations, assume[s] their veracity, and then 'determine[s] whether they plausibly give rise to an entitlement to relief.'"  Id. (quoting Iqbal, 556 U.S. at 679).  The last step is "'a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense.'" <u>Id.</u> (quoting <u>Iqbal</u>, 556 U.S. at 679).

## III.   DISCUSSION

Under Pennsylvania law,[4] the interpretation of an insurance contract is a question of law. <u>401 Fourth St., Inc. v. Investors Ins. Grp.</u>, 879 A.2d 166, 170 (Pa. 2005).  The task of interpreting an insurance contract is generally performed by the court rather than a jury, and "[t]he purpose of that task is to ascertain the intent of the parties as manifested by the terms used in the written insurance policy." <u>Id.</u> at 171.   "[A]ll provisions of an insurance contract must be read together and construed according to the plain meaning of the words involved, so as to avoid ambiguity while at the same time giving effect to all of its provisions." <u>Post v. St. Paul Travelers Ins. Co.</u>, 691 F.3d 500, 517 (3d Cir. 2012) (quoting <u>Masters v. Celina Mut. Ins. Co.</u>, 224 A.2d 774, 776 (Pa. Super. 1966)).  Where no genuine issues of material fact exist and "[w]hen the language of the policy is clear and unambiguous, a court is required to give effect to that language." <u>401 Fourth Street</u>, 879 A.2d at 171.

A policy is ambiguous where it is reasonably susceptible of more than one construction and meaning. <u>Pa. Nat'l Mut. Cas. Ins. Co. v. St. John</u>, 106 A.3d 1, 14 (Pa. 2014) (citation omitted). It is not ambiguous, however, merely because the parties disagree about its meaning, and policy language should not be stretched beyond its plain meaning to create an ambiguity. <u>Meyer v. CUNA Mut. Ins. Soc.</u>, 648 F.3d 154, 164 (3d Cir. 2011).   "Ambiguous terms must be strictly

---

[4]     Plaintiffs' businesses are located throughout Pennsylvania and New Jersey.  (Am. Compl. at ¶ 1.)  District Courts sitting in diversity must apply the choice of law rules of the forum state in determining which state's substantive law will be applied.  <u>Huber v. Taylor</u>, 469 F.3d 67, 73 (3d Cir. 2006).  Here, the substantive law in both Pennsylvania and New Jersey regarding contract interpretation is the same.  <u>On Air Entm't Corp. v. National Indem. Co.</u>, 210 F.3d 146, 149 (3d Cir. 2000).  Accordingly, I will refer interchangeably to the applicable laws of both states.

construed against the insurer, but the policy language must not be tortured to create ambiguities where none exist." Sikrica v. Nationwide Ins. Co., 416 F.3d 214, 220 (3d Cir. 2005).

The insured bears the initial burden of establishing coverage under the policy. State Farm Fire & Cas. Co. v. Estate of Mehlman, 589 F.3d 105, 111 (3d Cir. 2009) (citations omitted). If the insured meets that burden and the insurer relies on a policy exclusion as the basis for denying coverage, the insurer then has the burden of proving that the cited exclusion applies. Id.; Wolfe v. Ross, 115 A.3d 880, 884 (Pa. Super. Ct. 2015). Exclusions are strictly construed against the insurer. Selko v. Home Ins. Co., 139 F.3d 146, 152 n.3 (3d Cir. 1998). However, "[e]xclusions from coverage contained in an insurance policy will be effective against an insured if they are clearly worded and conspicuously displayed, irrespective of whether the insured read the limitations or understood their import." Pacific Indem. Co. v. Linn, 766 F.2d 754, 761 (3d Cir. 1985).

Here, Defendant argues that Plaintiffs have not plausibly alleged that they suffered covered losses under the Policy at issue. Plaintiffs respond that: (1) their losses are, in fact, covered losses within the Policy's terms, and (2) the "reasonable expectations" doctrine should operate to provide coverage.

### A.   Whether There Is a Covered Loss

In an effort to establish that they have properly pled a covered loss, Plaintiffs contend that insurance coverage for their COVID-19 related losses exists under either or both of the Business Income endorsement or the Civil Authority endorsement in the Policy.

#### 1.   Business Income Endorsement

Plaintiffs first argue that the relevant language in the Business Income endorsement is ambiguous and, therefore, must be interpreted in their favor as the policyholder. Specifically,

Plaintiffs contend that the definition of "direct physical loss of or damage to property" is ambiguous.  Plaintiffs further argue that, under their reasonable interpretation of the policy language, they have sufficiently alleged that they suffered direct physical loss of and damage to the Covered Properties in their Amended Complaint.  Plaintiffs press that the words "loss" and "damage" have a customary usage that is more expansive than "loss" and "damage" as used in Defendant's denial letter, and this customary usage includes "contamination" and "loss of use" of the Covered Properties as alleged in Plaintiffs' Amended Complaint.  For the following reasons, I disagree with Plaintiffs' interpretation of the Policy.

### a.  Physical Loss

Plaintiffs first allege that the meaning of the word "loss" under the Policy is ambiguous, and therefore I should resolve the ambiguity in favor of coverage.  Plaintiffs contend that the word "loss" is ambiguous because it has several ordinary meanings, including: (1) the fact of no longer having something or having less of it than before; (2) the disadvantage you suffer when a valuable and useful thing is taken away; (3) decrease in amount, magnitude, or degree; and (4) the amount of an insured's financial detriment by death or damage that the insurer is liable for.  (Am. Compl. at ¶ 47.)  Based on these definitions, Plaintiffs argue that a "loss," as the word is commonly used, does not need to be either direct or physical.  (Id. ¶ 48.)  Plaintiffs assert that they suffered a covered loss because the risk that COVID-19 could contaminate the Covered Properties rendered the properties unfit for their intended use.  (Id. at ¶ 49.)  To support their contention that "loss" may include "loss of use" of the property, Plaintiffs cite to several cases in which courts in other jurisdictions have interpreted similar policy language and held that allegations that the property was rendered "useless" or "unusable" constituted a loss.[5] (Pl. Opp. Br. at p. 7-11).

---

[5]    Plaintiffs cite North State Deli, LLC v. Cincinnati Ins. Co., 20-cv-2569, 2020 WL 6281507 (N.C. Super. Ct. Oct. 9, 2020) and Henderson Road v. Zurich, Case No. 1:20-cv-01238 (N.D. Ohio

Plaintiffs also claim that precedent from the United States Court of Appeals for the Third Circuit supports their position. Plaintiffs rely on two Third Circuit cases, <u>Port Authority of New York & New Jersey v. Affiliated FM Ins. Co.</u>, and <u>Motorists Mutual Co. v. Hardinger</u>, for the proposition that the presence of a virus or some other dangerous foreign substance may constitute a physical loss if it renders the property uninhabitable. In <u>Port Authority</u>, the Third Circuit considered an insurance claim for alleged losses due to the presence of asbestos. 311 F.3d 226, 235 (3d Cir. 2002). Interpreting an identical insurance provision under New Jersey and New York law, the Court remarked that allegations of physical damage to a building from "sources unnoticeable to the naked eye must meet a higher threshold." <u>Id.</u> at 235. The Court concluded that the "mere presence of asbestos, or the general threat of future damage from that presence, lacks the distinct and demonstrable character necessary for first-party insurance coverage." <u>Id.</u> at 236.

Subsequently, in the unpublished decision of <u>Motorists Mutual Ins. Co. v. Hardinger</u>, 131 F. App'x 823, 826 (3d Cir. 2005), the Third Circuit extended the principles dictated in <u>Port Authority</u> to the meaning of "direct physical loss" under Pennsylvania law. <u>Id.</u> at 826. The insureds in that case sought insurance coverage due to the presence of bacteria in the home's well that caused them to become sick. <u>Id.</u> at 824. The Third Circuit reiterated the standard set forth in <u>Port Authority</u> and noted that, where the damage involves "sources unnoticeable to the naked eye," "physical loss or damage" occurs where that source nearly eliminates or destroys the property, renders it "useless or uninhabitable," or causes "loss of utility." <u>Id.</u> at 826 (citing <u>Port Authority</u>). The Court found that summary judgment was inappropriate in that case because there was a

_____

Jan. 29, 2021) to argue that physical loss and physical damage must have different meanings because the phrase "physical loss of or damage to" is phrased in the disjunctive. Defendant does not contest this point. (See Def.'s Rep. Br. at p. 4). However, Plaintiffs do not explain the significance of that fact or explain why this makes the terms of the Policy ambiguous.

9

genuine issue of fact as to whether the functionality of the insureds' home was nearly eliminated or destroyed, or whether property was made useless or uninhabitable by the presence of bacteria in the home.  Id. at 826–27.

Plaintiffs misconstrue Port Authority and Motorists Mutual's interpretation of "loss" under these types of insurance policies.  In order to find a "physical loss" when the property is not physically altered, Third Circuit precedent requires that the property's "function [be] nearly eliminated or destroyed." Motorists Mutual, 131 F. App'x at 826.  When the "structure continues to function" there is no physical loss that would be eligible for coverage.  Id.  Stated differently, "[t]he words 'direct' and 'physical,' which modify the word 'loss,' ordinarily connote actual, demonstrable harm of some form to the premises itself, rather than forced closure of the premises for reasons extraneous to the premises themselves, or adverse business consequences that flow from such closure." Crescent Plaza Hotel Owner L.P. v. Zurich Am. Ins. Co., No. 20-cv-3463, 2021 WL 633356, at *2 (N.D. Ill. Feb. 18, 2021).

As set forth in Port Authority and Motorists Mutual, a "loss" occurs where a property's function is nearly eliminated.  Here, not only was there no physical alteration to the Covered Properties, but there was also no loss of utility of the buildings.  Indeed, Plaintiffs admit that they "could remain open, but only for essential surgeries, not elective." (Am. Compl. at ¶ 77.)  And Plaintiffs' loss of their ability to perform elective surgeries does not render the building "uninhabitable." Rather, their ability to conduct business was limited, which resulted in purely economic losses.  For this reason, I do not accept Plaintiffs' proffered broad interpretation of "loss" to include a partial loss of use of their facilities.  See Spring House Tavern, Inc. v. American Fire and Casualty Co., No. 20-2872, 2021 WL 2473939, at * 4 (E.D. Pa. June 16, 2021) (rejecting

plaintiff's interpretation of "physical loss" to include a partial loss of use of the building due to COVID-19 Closure Orders).[6]

### b. Physical Damage

Plaintiffs next argue that "damage" under the Policy is not limited to visible structural alterations to the property and can also include "physical damage. . . from 'sources unnoticeable to the naked eye.'" (Pl. Opp. Br. at p. 11).  Plaintiffs claim they should be covered under the Policy for damage caused by a social phenomenon they call "the COVID-19 Effect."  Plaintiffs submit that social anxiety and the public's general fear of indoor establishments due to the pandemic created a "physical loss of and damage" to their Covered Properties.

Direct physical damage is "a distinct, demonstrable, physical alteration of the property." Newchops Restaurant Comcast LLC v. Admiral Indem. Co., 507 F. Supp. 3d 616, 623 (E.D. Pa. 2020) (quoting 10A Couch on Ins. § 148.46 (3d ed. 1995) (citation omitted)).  "Fire, water, smoke, and impact from another object are typical examples of physical damage from an outside source that may demonstrably alter the components of a building and trigger coverage." Port Authority, 311 F.3d at 235.  "Pure economic losses are intangible and do not constitute property damage." Newchops, 507 F. Supp. 3d at 624 (quoting 9A Couch on Ins. § 129.7).

In pressing for coverage despite the Covered Properties having suffered no structural damage, Plaintiffs argue their circumstances are similar to the facts alleged in Fireman's Fund Insurance Co. v. Community Coffee Co., C.A. No. 06-2806, 2007 WL 1076790 (E.D. La. Apr. 9,

---

[6]      Plaintiffs cite to several out-of-circuit cases where courts have declined to dismiss insurance claims for losses due to COVID-19.  I find these cases distinguishable.  See Studio 417, Inc. v. Cincinatti Ins. Co., 478 F. Supp. 3d 794, 802 (W.D. Mo. 2020) (finding that plaintiff had plausibly pled "physical loss or damage" by expressly pleading that COVID-19 "particles attached to and damaged" their property); Goodwill v. Phila Indem. Ins. Co., (Super Ct. Orange County, 2021, No. 30-2020-01169032-CU-IC-CXC) (overruling defendant's demurrer and finding that COVID-19 may have caused physical damage to plaintiff's property when plaintiff alleged COVID-19 was actually present at its properties).

2007).  In <u>Fireman's Fund</u>, the owners of a coffee shop in New Orleans sought recovery from their insurance company for damage to their coffee in the wake of Hurricane Katrina.  <u>Id.</u> at *1.  Defendants filed a motion for summary judgment.  The "property damage" plaintiffs sought coverage for was not physical damage to their facility, but rather a diminution in the value of their coffee due to the "Katrina Effect."  The "Katrina Effect," plaintiffs contended, was a widely held public perception that all property stored in New Orleans had been damaged or somehow impaired from the hurricane, which deterred customers from purchasing their products.  The District Court for the Eastern District of Louisiana denied defendant's motion for summary judgment, holding that a genuine issue of material fact existed as to whether the coffee actually suffered physical damage.

Importantly, the court in <u>Fireman's Fund</u> focused on the potential *water* damage the coffee may have suffered *as a result of the hurricane itself,* not as a result of the "Katrina Effect."  In denying summary judgment, the court noted that a warehouse representative testified that "coffee in these warehouses was in fact exposed to prolonged moisture due to water on the floor."  <u>Id.</u> at *4.  He further testified that there were outstanding concerns regarding the moist and damp conditions that existed in the warehouses for more than a month after the storm.  The court concluded that while the extent of the damage the various warehouses suffered was disputed, it was unclear whether the coffee stored in the warehouses was physically damaged, therefore precluding summary judgment.  And while the court did note that the diminution in value of the coffee was not explicitly precluded under the policy, it did not indicate one way or another that the "Katrina Effect" theory of damage would be accepted as the justification for such coverage.  The analysis, instead, focused on the evidence of potential water damage in the record.

The case before me is unlike <u>Fireman's Fund</u> and the other cases Plaintiffs cited to support their argument for a finding of physical damage.  In those cases, either: (1) there was actual structural damage accompanying the nonphysical damage, like the water damage in <u>Fireman's Fund</u>, or (2) the source of physical damage "unnoticeable to the naked eye" rendered the property entirely useless and uninhabitable.  <u>See</u> <u>Western Fire Ins. Co. v. First Presbyterian Church</u>, 165 Colo. 34, (1968) (loss of use of property covered under the policy where the accumulation of gasoline around the property rendered it uninhabitable); <u>Gregory Packaging Inc. v. Travelers Prop. Cas. Co. of Am.</u>, No 2:12-cv-04418, 2014 WL 6675934 (D.N.J. Nov. 25, 2014) (presence of ammonia in the building that rendered it unsafe for human occupancy constituted physical damage to the property); <u>Customized Distribution Servs. v. Zurich Ins. Co.</u>, 862 A.2d 560 (N.J. Super. Ct. App. Div. 2004) (misrotation of soda bottles that caused the product to expire before it could be sold constituted direct physical loss).  Accordingly, I am not persuaded by Plaintiffs' argument that the "COVID-19 Effect" caused the Covered Properties physical damage absent a showing of some actual structural damage to the buildings.

My interpretation is supported by the language in the Business Income endorsement that the covered loss of business income is that sustained "due to the necessary suspension of your 'operations' *during the 'period of restoration'*."  The Policy defines "period of restoration" as beginning with the date of "direct physical loss or damage" and ending on the earlier of "[t]he date when the property at the 'described premises' should be repaired, rebuilt or replaced with reasonable speed and similar quality" or "the date when business is resumed at a new permanent location."  (Am. Compl., Ex. 1, p. 49.)  In other words, the Policy provides coverage during a "period of restoration" requiring some correction of a physical condition at the property.  "If there is no requirement that physical loss of or physical damage to the property be involved, the

definition of the time for paying the claim makes no sense." <u>Real Hospitality LLC v. Travelers Cas. Ins. Co. of Am.</u>, No. 20-cv-0087, 2020 WL 6503405, at *6 (S.D. Miss. Nov. 4, 2020).[7]

In finding that Plaintiffs have not sufficiently alleged that they suffered either direct physical loss or damage to the Covered Properties, I note that numerous decisions from within this Circuit are instructive on whether the threat of COVID-19 constitutes "direct physical loss or direct physical damage to property." These decisions have uniformly concluded that such a threat does not trigger insurance coverage. <u>See, e.g.</u>, <u>Paul Glat MD, P.C. v. Nationwide Mut. Ins. Co.</u>, No. 20-cv-5271, 2021 WL 1210000, at *5–6 (E.D. Pa. Mar. 31, 2021); <u>Eric R. Shantzer, DDS v. Travelers Cas. Ins. Co. of Am.</u>, No. 20-cv-2093, 2021 WL 1209845, at *4 (E.D. Pa. Mar. 31, 2021); <u>Tria WS LLC v. Am. Auto. Ins. Co.</u>, No. 20-cv-4159, 2021 WL 1193370, at *3–5 (E.D. Pa. Mar. 30, 2021); <u>Chester Cty. Sports Arena v. The Cincinnati Specialty Underwriters Ins. Co.</u>, Nos. 20-cv-2021 et al., 2021 WL 1200444, at *7 (E.D. Pa. Mar. 30, 2021); <u>Kahn v. Pa. Nat'l Mut. Cas. Ins. Co.</u>, 517 F. Supp. 3d 315, 323 (E.D. Pa. 2021); <u>Frank Van's Auto Tag LLC v. Selective Insurance Co.</u>, 516 F. Supp. 3d 450, 459 (E.D. Pa. 2021); <u>1 S.A.N.T., Inc. v. Berkshire Hathaway, Inc.</u>, 513 F. Supp. 3d 623, 626 (W.D. Pa. 2021); <u>Rest. Grp v. Certain Underwriters at Lloyd's, London</u>, 513 F. Supp. 3d. 525, 534 (E.D. Pa. 2021); <u>Ultimate Hearing Solutions II, LLC v. Twin City Fire Ins. Co.</u>, 513 F. Supp. 3d 549, 558 (E.D. Pa. 2021); <u>Newchops</u>, 507 F. Supp. 3d at 623; <u>Kessler Dental Assocs., P.C. v. Dentists' Ins. Co.</u>, 505 F. Supp. 474, 481 (E.D. Pa. 2020); <u>4431,</u>

---

[7] Plaintiffs argue that the period of restoration in this case began on the dates the Closure Orders went into effect and "ended/will end on the dates the in-person restrictions were/are fully lifted." (Pl. Opp. Br. at p. 16-17). This is inconsistent with a plain reading of the Policy's requirement that the property be "repaired, rebuilt, or replaced." The issuance and lifting of the Closure Orders do not have a bearing on the structural condition of the premises, as the Policy language requires. Accordingly, the lifting of the Closure Orders cannot be considered a "repairing" of the property for purposes of the period of restoration requirement, as Plaintiffs suggest.

<u>Inc. v. Cincinnati Ins. Cos.</u>, 504 F. Supp. 368, 385 (E.D. Pa. 2020); <u>Toppers Salon & Health Spa,</u> <u>Inc. v. Travelers Prop. Cas. Co. of Am.</u>, 503 F. Supp. 3d 251, 257 (E.D. Pa. 2020); <u>Brian Handel</u> <u>D.M.D., P.C. v. Allstate Ins. Co.</u>, 499 F. Supp. 3d 95, 100 (E.D. Pa. 2020).[8]

I concur with my colleagues and find that Plaintiffs have not plausibly alleged either physical loss or physical damage within the meaning of the Policy. Unlike in <u>Motorist's Mutual,</u> where there were specific allegations of bacteria in the insured property, in the matter before me, Plaintiffs do not aver that the COVID-19 virus was present at the Covered Properties. Thus, contrary to the cases on which Plaintiffs rely, Plaintiffs admit that there was no physical source or threatened presence of a physical source that caused Plaintiffs' inability to use their properties for their intended purpose. Indeed, the Amended Complaint does not allege any facts regarding physical integrity or use of the Covered Properties.

---

[8] Plaintiffs identify one Pennsylvania state court case that rejected a motion to dismiss for business interruption insurance due to COVID-19. In <u>Ridley Park Fitness, LLC v. Philadelphia</u> <u>Indemnity Ins. Co.</u>, 2020 WL 8613467 (Phila. Com. Pl. Aug. 31, 2020), the Philadelphia Court of Common Pleas, via a footnote order, declined to dismiss a complaint seeking insurance coverage for business losses at a fitness center as a result of the pandemic and the resulting Closure Orders. <u>Id.</u> at *1. The court provided no statement of the relevant policy provisions but, rather, simply found that "it would be premature for this court to resolve the factual determinations put forth by defendants to dismiss plaintiff's claims." <u>Id.</u> Given the absence of any rationale for the court's decisions, I do not find the persuasiveness of this ruling to outweigh that of the rulings by my colleagues in federal court.

Plaintiffs also cite to a decision by the New Jersey trial court, in <u>Optical Services USA v. Franklin</u> <u>Mutual Insurance Co.</u>, No. BER-L-3681-20, wherein the judge denied a motion to dismiss a claim for insurance coverage resulting from the shutdown orders. Applying New Jersey law, the court— via an oral decision—declined to find, absent further discovery, whether the loss of use of a business due to a New Jersey state order deeming all non-essential businesses unsafe constituted a direct physical loss or direct physical damage under the insurance policy. (Pl.'s Resp., Ex. 3.) I disagree with this ruling because interpretation of an insurance contract is purely legal and does not require discovery.

2.     The Civil Authority Endorsement

Plaintiffs next contend that even if coverage did not exist under the Business Income endorsement of the Policy, coverage was extended to this particular situation under the Civil Authority endorsement.  This endorsement states, in pertinent part:

> When the Declarations show that you have coverage for Business Income and Extra Expense, you may extend that insurance to apply to the actual loss of Business Income you sustain and reasonable and necessary Extra Expense you incur caused by action of civil authority that prohibits access to the described premises. The civil authority action must be due to direct physical loss of or damage to property at locations, other than [the] described premises, caused by or resulting from a Covered Cause of Loss.

(Am. Compl., Ex. 1., p. 80.)

Plaintiffs argue that they incurred losses due to the Closure Orders issued by Governors Wolf and Murphy.  They further allege that the Closure Orders were issued because of the "risk of loss" COVID-19 posed to properties in the immediate area surrounding the Covered Properties. (Id. at ¶ 85.) Plaintiffs suggest that the "risk" of loss is a covered cause of loss under the Policy because the Policy defines "Covered Cause of Loss" as "risks of direct physical loss . . ." (Pl. Opp. Br. at p. 14-15).  Accordingly, Plaintiffs contend that each element of Civil Authority coverage is pled because the Closure Orders (1) were issued due to the risks posed by COVID-19, and (2) prohibited access to the Covered Properties.

Plaintiffs' argument fails because the Amended Complaint here is devoid of any allegation that any property in the surrounding area of the premises experienced any "direct physical loss or direct physical damage."  See Frank Van's, 516 F. Supp. 3d at 459 (holding that failure to allege that other properties sustained damage is fatal to coverage under a Civil Authority provision). Plaintiffs have not alleged the presence of COVID-19 at any neighboring properties.  Even if the

risk of COVID-19 contamination constituted a covered cause of loss under the Policy, that risk would still have to cause "direct physical damage" to a neighboring property in order to be covered.

Moreover, the relevant Closure Orders were not issued in response to "direct physical loss of or damage to property at locations, other than [the] described premises, caused by or resulting from a Covered Cause of Loss."  Rather, according to the allegations in the Amended Complaint, the Closure Orders were issued to *prevent* the spread of the COVID-19 virus to any of these properties.  (Am. Compl. ¶ 85 ("The Civil Authority Orders were implemented to prevent the spread of COVID-19 by prohibiting and/or limiting people from entering the Covered Properties. .").).  Such allegations bring this claim outside the coverage of the Civil Authority endorsement. See Frank Van's, 516 F. Supp. 3d at 459 ("[T]he orders enforced the stated need for social distancing to prevent future viral transmission. . . . But the fear of the virus in nearby properties does not establish physical damage."); Toppers, 503 F. Supp. 3d at 257 ("[Plaintiff] did not close because of damage to a nearby premise or because there was some dangerous physical condition at another nearby premise.  It closed because the Shutdown Orders applied to its own operations. Its shutdown and resulting losses fall outside the scope of the Civil Authority coverage."); Newchops, 507 F. Supp. 3d at 625 (noting that "[t]he shutdown orders and accompanying proclamations were in response to the COVID-19 health crisis, not damage to any property—the insureds' or another's.").[9]

---

[9]     Plaintiffs also argue the language of the Civil Authority endorsement is ambiguous because it is unclear whether the civil authority action must be "taken in response to dangerous conditions from damage that already exists, or in anticipation of dangerous conditions from damage that has yet to occur. . ." (Pl. Opp. Br. at p. 15).  However, a plain reading of the policy language indicates that the former is true.  The Policy specifically states, "[t]he civil authority action must be due to direct physical loss of or damage to property at locations, other than [the] described premises." This does not include anticipation of dangerous conditions that have yet to occur.

In an effort to establish Civil Authority coverage, Plaintiffs cite to <u>Narricot Industries, Inc.</u> <u>v. Fireman's Fund Ins. Co.</u>, No. 01-cv-4679, 2002 WL 31247972 (E.D. Pa. Sept. 30, 2002).  In that case, a hurricane struck North Carolina causing power outages, downed radio systems, road flooding, and a flooded water treatment plant, prompting the mayor to declare a state of emergency and suspend the operation of all plants, including the plaintiff's plant.  <u>Id.</u> at *1.  The Insurer denied coverage for the resulting losses because it found that the civil authority orders were "preventative," in that they were designed to prevent damage from the hurricane and did not result from a covered cause of loss.  <u>Id.</u> at *5.  The court rejected this argument and found that the "covered cause of loss" (hurricane or flood) was the cause of the civil authority orders and "[r]egardless of whether [the municipality] took the measures to prevent hurricane and flood damage or alleviate the perils caused by hurricane and flood damage, the measures still *resulted* from hurricane and flood."  <u>Id.</u> (emphasis in original).  Relying on this holding, Plaintiffs here argue that civil authority orders issued to prevent physical loss, such as those at issue, necessarily result from a covered cause of loss.

<u>Narricot</u> is distinguishable because a hurricane and flood (both covered causes of loss under the relevant insurance policy) actually occurred, resulting in damage to property other than the insured premises, including electrical lines, a wastewater treatment plant, and a raw water pump station.  <u>Id.</u> at *4.  Because of this damage, the municipality issued civil orders to suspend the operation of all plants, including the insured premises, to avoid further damage due to the water system being shut down.  As such, consistent with the "Civil Authority Clause" in the insurance policy (and unlike the case before me), the insured in <u>Narricot</u> had alleged a "direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any 'covered cause of loss.'"  <u>Id.</u> at *4.  The court took care to distinguish the facts at issue—where

the civil authority actions were taken *in response* to damage caused by a covered peril—from a situation where a civil authority action is used to *prevent* a covered peril. Id. at *5.[10]

The situation here falls within that latter category because, according to the Amended Complaint, the Closure Orders were issued to *prevent* loss at Plaintiffs' properties and other properties and were not issued in response to property damage or loss at a nearby property. Accordingly, I find that the Amended Complaint fails to plausibly allege coverage under the Civil Authority endorsement.[11]

**B.    Reasonable Expectations Doctrine**

In the event that their other arguments for coverage are unsuccessful, Plaintiffs alternatively invoke Pennsylvania's reasonable expectations doctrine.  Plaintiffs argue that even if the language of the Policy appears to preclude coverage, Pennsylvania law provides them an alternative path for recovery.  Plaintiffs suggest that, because they reasonably expected coverage

---

[10]    Plaintiffs' reliance on Friends of Danny DeVito v. Wolf, 227 A.3d 872 (Pa. 2020) is also misplaced.  That case involved a direct challenge to Governor's Wolf's constitutional authority to issue the Closure Orders.  It did not involve interpretation of insurance policies or whether the pandemic resulted in any direct physical damage or loss.  It held only that COVID-19 is a natural disaster that triggers the Governor's executive authority because it "is unquestionably a catastrophe that 'results in . . . hardship, suffering or possible loss of life.'"  Id. at 888 (ellipses in original) (quoting 35 Pa. Cons. Stat. § 7102).

[11]    Defendant argues that the Closure Orders did not actually prohibit access to the Covered Properties, as required under the Policy.  (Def.'s Mot. at 22).  However, the Closure Orders in fact did prohibit access to the Covered Properties.  The Policy does not require total inaccessibility. Because it is not stated whether total or partial inaccessibility is required, that portion of the Policy is ambiguous.  Construing the ambiguity in Plaintiffs' favor, I hold that partial inaccessibility is sufficient and that the prohibition of access portion of Civil Authority coverage is met.  See Paul Glat MD, P.C., 2021 WL 1210000, at *n. 17 ("[C]onstruing the ambiguity in Glat's favor, we conclude that any restriction of access, total or partial, to the property satisfies the prohibited access element of the civil authority provision.")); but see 1 S.A.N.T., Inc., 513 F. Supp. 3d at 632 (civil authority coverage was not implicated when plaintiff's restaurant remained open for takeout and delivery services and therefore, they were not denied access to the facilities).

for their COVID-19 related losses, that expectation should prevail over the plain language of the Policy.

The Pennsylvania doctrine of reasonable expectations states that "[t]he reasonable expectations of the insured is the focal point of the insurance transaction . . . regardless of the ambiguity, or lack thereof, inherent in a given set of documents." Collister v. Nationwide Life Ins. Co., 388 A.2d 1346, 1353 (Pa. 1978). "It is intended to protect against the inherent danger, created by the nature of the insurance industry, that an insurer will agree to certain coverage when receiving the insured's application, and then unilaterally change those terms when it later issues a policy." UPMC Health Sys. v. Metro. Life Ins. Co., 391 F.3d 497, 502 (3d Cir. 2004) (citing Tonkovic v. State Farm Mut. Auto. Ins. Co., 521 A.2d 920 (Pa. 1987) ("We hold that where, as here, an individual applies and prepays for specific insurance coverage, the insurer may not unilaterally change the coverage provided without an affirmative showing that the insured was notified of, and understood, the change, regardless of whether the insured read the policy.")).

The Third Circuit has applied this doctrine in cases "where the insured reasonably expected certain coverage, even when those expectations were in direct conflict with the unambiguous terms of the policy." Id. at 503 (citing Bensalem Twp. v. Int'l Surplus Lines Ins. Co., 38 F.3d 1303 (3d Cir. 1994) (reversing dismissal of an insured's declaratory judgment action where insurer had unilaterally expanded an exclusion in a professional liability insurance policy)). Although "in most cases, the language of the insurance policy will provide the best indication of the content of the parties' reasonable expectations," the courts must nevertheless "examine the 'totality of the insurance transaction involved to ascertain the reasonable expectations of the insured." Liberty Mut. Ins. Co. v. Treesdale, Inc., 418 F.3d 330, 344 (3d Cir. 2005) (quoting Reliance Ins. Co. v. Moessner, 121 F.3d 895, 903 (3d Cir. 1997)). This aspect of the doctrine is only applied "in very

limited circumstances" to protect non-commercial insureds from policy terms not readily apparent and from insurer deception.  Madison Constr. Co. v. Harleysville Mut. Ins. Co., 735 A.2d 100, 109 n.8 (Pa. 1999).  Absent sufficient justification, however, "an insured may not complain that his or her reasonable expectations were frustrated by policy limitations that are clear and unambiguous." Treesdale, 418 F.3d at 344 (3d Cir. 2005) (quoting Frain v. Keystone Ins. Co., 640 A.2d 1352, 1354 (Pa. Super. 1994)).

I find that the doctrine of reasonable expectations does not apply here because, as described at length throughout this opinion, the Policy in this case is unambiguous and Plaintiffs have not sufficiently pled a direct physical loss or damage to their properties.  See Frederick Mut. Ins. Co. v. Hall, 752 F. App'x. 115, 117 (3d Cir. 2018) ("Generally, courts cannot invoke the reasonable expectation doctrine to create an ambiguity where the policy itself is unambiguous.").

## C.   The Absence of a Virus Exclusion

Lastly, Plaintiffs argue that the absence of a virus exclusion within the Policy requires that I find coverage for their losses.  Specifically, Plaintiffs contend that if Defendant wanted to exclude coverage for loss or damage attributable to viruses, it should have explicitly excluded it in the language of the Policy.  Plaintiffs highlight that the Policy is an "all-risk" policy, meaning that coverage should be afforded unless specifically excluded.

Plaintiffs are correct that an "all-risk" policy is a special kind of insurance policy that "covers every kind of insurable loss except what is specifically excluded." Betz v. Erie Ins. Exch., 957 A.2d 1244, 1255–56 (Pa. Super. Ct. 2008) (quoting Black's Law Dictionary 815 (8th ed. 2004)); see also 10 Couch on Ins. § 148:50 ("A property insurance policy which covers 'physical loss or damage to property insured from any external cause' is properly construed to be an 'all-risk' policy.").  However, "[t]he term 'all-risk' has been said to be 'somewhat

misleading'" as "'[a]ll-risk' is not synonymous with 'all loss.'"  <u>Intermetal Mexicana, S.A. v. Ins. Co. of N. Am.</u>, 866 F.2d 71, 75 (3d Cir. 1989).  Rather, "the responsibility under a first-party 'all risks' policy must be determined by the terms and conditions of the contract."  <u>Port Authority</u>, 311 F.3d at 234 (citing 10 <u>Couch on Ins.</u> § 148:48 (3d Cir. 1998) ("A loss which does not properly fall within the coverage clause cannot be regarded as covered thereby merely because it is not within any of the specific exceptions . . . .")).  Here, as explained above, Plaintiffs have failed to plead a physical loss or damage to their properties.  As Defendant noted in its reply brief, the absence of a virus exclusion cannot create a basis for coverage when the alleged loss does not trigger coverage in the first place.[12]

## IV.    CONCLUSION

I am sympathetic to Plaintiffs and other similarly situated business owners who have suffered losses because of the pandemic.  Nonetheless, the fact remains that the Policy here, as written, does not provide coverage for the loss of business income Plaintiffs have suffered.  Accordingly, I will dismiss the Amended Complaint with prejudice.

An appropriate Order follows.

---

[12]    Plaintiffs additionally argue that their declaratory judgment claim is distinct from their breach of contract claim.  Because I find there is no coverage under the policy, I will not address this argument.